UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

  *Plaintiff-Appellee,*

v.

JORGE MORA,

  *Defendant-Appellant.*

No. 00-4328

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
Frank W. Bullock, Jr., District Judge.
(CR-99-223)

Argued: February 26, 2001

Decided: July 31, 2001

Before WIDENER, MOTZ, and KING, Circuit Judges.

---

Vacated and remanded by unpublished opinion. Judge Widener wrote the opinion, in which Judge Motz and Judge King joined.

---

## COUNSEL

**ARGUED:** Jeffrey S. Lisson, Winston-Salem, North Carolina, for Appellant. Harry L. Hobgood, Assistant United States Attorney, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Walter C. Holton, Jr., United States Attorney, Greensboro, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

WIDENER, Circuit Judge:

Jorge Mora (Mora) appeals a jury conviction under 18 U.S.C. § 1028(a)(3) (2000) for the possession of five or more false United States identification documents. Because the jury was not adequately instructed on the elements of wire fraud, we vacate Mora's conviction and remand for a new trial.

I.

Mora was president of AmBienTemps, Inc. (AmBien), which is a temporary employment agency in High Point, North Carolina that supplies asbestos-removal workers in five or six states. Most of AmBien's applicants are foreign and thus must have a valid resident alien work authorization card (green card) or a social security number so that they may work in the United States.

Mora interviewed and hired applicants, and he signed Immigration and Naturalization Service (INS) Eligibility Verification Forms[1] (form I-9) for the employees. As part of AmBien's business routine,

---

[1]Congress enacted the Immigration and Control Act of 1986 (IRCA) to reduce employment of unauthorized workers. See H.R. No. 101-723(i) at 46 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5649, 5650. It established an employer verification system. The I-9 form is a mechanism to ensure that workers are authorized to work. See 8 U.S.C. § 1324a(b)(1)(A); 8 C.F.R. § 274a.2(b)(ii). The employee tenders to the employer certain identification documents, which are then listed on the form. See 8 U.S.C. §§ 1324a(b), 1324b(b)(1)(C). An employer must accept all documents that appear genuine on their face. See 8 U.S.C. § 1324a(b). If an employer complies with the § 1324a(b) employee verification requirements, the employer has a good faith defense to civil or criminal liability for employing unauthorized workers. See 8 U.S.C. § 1324a(a)(3).

photocopies were made of green cards, social security cards, and state asbestos licences, and these copies were placed in the employees' files. Copies of these files were then forwarded, usually by fax or packets hand-delivered by the workers, to the asbestos contractors who used AmBien's workers. The original cards were returned to the workers.

On October 8 and October 16, 1997, INS Agent Charles Goodman conducted an inspection of AmBien, and Mora gave him 100 I-9 forms from hires within the last three months. The majority were signed by Mora, and approximately 77 had invalid green card numbers. Goodman told Mora to fire the workers who did not provide verification documents and gave him a booklet[2] regarding how to detect counterfeit cards. Mora fired, or did not employ, 23 employees who had provided invalid work authorization numbers. INS then closed its investigation finding AmBien in "adjusted compliance."

The government relates that asbestos-removal workers are generally required to be licenced by States. The Division of Public Health of the North Carolina Department of Health and Human Services requires asbestos-removal workers in North Carolina to be licenced. Workers must complete a basic course in asbestos removal by an accredited school, which is valid for one year. They then must take a refresher course from an accredited school. Each year the Department accredits 1900 workers, 90% of whom are foreign. AmBien operated Wellington House, an asbestos-removal training school licenced by North Carolina in both the basic and refresher courses. North Carolina revoked the training licence for the basic course in 1993 and 1995; it was allowed to teach the refresher course.

In December 1998, EPA agent Ivan Viken interviewed various state asbestos-removal licensing officials, INS agents, AmBien employees, and contractors who do business with AmBien. EPA agents then executed a search warrant at AmBien offices on March 10, 1999.

---

[2]The pamphlet was entitled, "What Color is Your Green Card?". On October 16, 1997, Agent Goodmen instructed Mora regarding how to spot false cards by looking at the type face, whether the photo is raised, and where the letters line up.

In Mora's office, Viken located five counterfeit green cards and four invalid social security cards relied upon in the indictment in an envelope in a credenza located about 4 or 5 feet behind Mora's desk. The agents also found 285 asbestos worker licenses in Mora's desk and credenza in various names issued by various States. Mora testified that he was unaware that many were in his office. Of a sample of 229 social security numbers listed, 179 were invalid.

The agents then examined approximately 1251 personnel files from employees in 1998 and 1999, located in Bill Williams' office, the AmBien accountant. The district court allowed evidence at trial (over an in limine objection) establishing that there were 1251 different social security numbers in these files—982 of which were found invalid by Frank Maroney, Jr. of the Social Security Administration. The district court similarly allowed evidence over objection that there were 969 different green card numbers compiled into a list by Agent Viken—879 of which were found invalid by Agent Goodmen. Goodmen testified that an employer could call the INS to verify a suspicious green card number only if they are in a pilot program. AmBien was not.

The agents also discovered canceled payroll checks for the five individuals with the invalid green cards mentioned in the indictment. A former AmBien employee testified that Mora instructed her to add to the Wellington School roster names of persons who did not attend that training. Mora denied the allegation. The government did not present any testimony from AmBien customers at trial.

Mora was indicted on August 30, 1999 and charged in one count with violating 18 U.S.C. § 1028(a)(3) for possessing five or more false United States identification documents (the five green cards and four social security cards) with the intent to use them unlawfully. The indictment alleged that Mora possessed six false green cards and six false social security cards. On November 17, 1999, the indictment was redacted upon motion of the government to charge possession of only five false green cards and four false social security cards.

Mora was convicted by a jury in November 19, 2000 and was sentenced on March 28, 2000 to 15-months imprisonment and fined

$25,000 under United States Sentencing Guideline § 2L2.1. He timely appealed on April 20, 2000.

## II.

We exercise jurisdiction pursuant to 28 U.S.C. § 1291. We review a district court's jury instructions de novo. See *United States v. Ellis*, 121 F.3d 908, 913 (4th Cir. 1997).

This appeal involves the interrelation between the statutory elements for two separate offenses. The indictment in this case alleges that Mora violated 18 U.S.C. § 1028(a)(3). Congress adopted the False Identification Crime Control Act of 1982, Pub. L. No. 97-398, 96 Stat. 2009, of which § 1028(a)(3) is a part, to create federal offenses relating to possession of false identification documents, counterfeiting of identification documents, and trafficking in such documents. See H.R. Rep. No. 802, 97th Cong., 2d Sess. 1, *reprinted in* 1982 U.S.C.C.A.N. 3519, 3519. In creating the § 1028(a)(3) offense, Congress made an element of the offense an "intent to use unlawfully" the false identifications possessed. 18 U.S.C. § 1028(a)(3). Accordingly, possession of five or more false identifications violates § 1028(a)(3) when the intended use of the documents would also "violate[ ] a federal, state or local law, or [be] part of the making of a misrepresentation that violates a law." H.R. Rep. No. 802, 97th Cong., 2d Sess. 10, *reprinted in* 1982 U.S.C.C.A.N. 3519, 3529.

Thus, for a jury to conclude that a defendant intended to use false identifications unlawfully, the government must establish two things: 1) the uses to which defendant intended to put the false identifications and 2) that those intended uses would violate one or more federal, state, or local laws. See *United States v. Rohn*, 964 F.2d 310, 313 (4th Cir. 1992). The elements of a § 1028(a)(3) offense thus are: 1) possession of five or more false identification documents; 2) the defendant knew the identification documents were false; 3) the documents were or appeared to be issued by the United States; 4) and the possession was with the *intent to use them unlawfully*. See § 1028(a)(3)(c) (emphasis added). This case presents a question with respect to jury instructions for the final element.

*Rohn* requires the government to present to the jury a specific offense that satisfies the "unlawfully" element—rather than relying on mere notions of right and wrong. See *Rohn*, 964 F.2d at 312-13. Rohn was charged with violating § 1028(a)(3). At trial, over 70 pieces of false identification were admitted into evidence, including social security cards, driver's licences, bank cards, birth certificates, and student identification cards. See *Rohn*, 964 F.2d at 312. During deliberations, the jury asked the court whether fleeing to avoid arrest was unlawful. See *Rohn*, 964 F.2d at 312. In response, the district court relying on 18 U.S.C. § 1073 stated, "Yes—it is a violation of federal law to travel or move in interstate commerce with intent to avoid prosecution for a felony under the laws of the place from which one flees." *Rohn*, 964 F.2d at 312.

On appeal, we noted that although there was a law (unlawful flight) cited to the jury in that case, we emphasized that the government "presented no evidence at trial" regarding the felony nature of her outstanding warrants. See *Rohn*, 964 F.2d at 313. In reference to this fact, we noted that because of this lack of proof the government did not contend that the instruction relating to this law was sufficient to support the verdict. In an attempt to get around this lack of evidence, the government argued that the district court was not required to cite for the jury any particular law that the intended uses would have violated. See *Rohn*, 964 F.2d at 313-14. But we rejected this argument. We held that the text of § 1028(a)(3) and its legislative history showed Congress' intent that the government prove that the intended use was unlawful. See *Rohn*, 964 F.2d at 313-14. Absent an instruction being given on an unlawful use, we held that the conviction could not stand. See *Rohn*, 964 F.2d at 313. We cautioned that this showing does not mandate proving that the defendant actually put the document to the unlawful use—but rather, only that the defendant's intended use would have violated some law. See *Rohn*, 964 F.2d at 313 n.3. We apply these principles to the conviction at hand.

In order to convict properly under § 1028(a)(3), the first three elements of § 1028 must be met as well as an intent to use the documents named in the indictment unlawfully. At trial,[3] the government alleged

---

[3]The indictment did not refer to the wire fraud statute, and Mora apparently did not learn of the specific alleged intended use until trial.

that the final element of § 1028(a)(3) was met with an intent to violate the federal wire fraud statute. The government articulated its theory of the case during its opening remarks and closing argument: Mora intended to use the false green and social security cards to carry out a wire fraud scheme to defraud its customers, asbestos-removal contractors, by providing them with workers using false identification, many of whom had not been properly trained. In this regard, the court instructed the jury on the elements of § 1028 as well as the elements of wire fraud as follows:

> Now, the Government contends that the defendant's intended use would have violated Title 18, United States Code, Section 1343, which makes it a Federal crime for anyone to use interstate wire communication facilities in carrying out a scheme to defraud. The offense of wire fraud is committed when a person having devised or intending to devise a scheme to defraud or obtain money by false or fraudulent pretenses, transmits or causes to be transmitted by wire in interstate commerce any writings for the purpose of executing such scheme.

> It is not necessary that the Government prove that the use of interstate wire communications was intended to be the sole or exclusive means of accomplishing that fraud. It is not necessary that the Government prove that the defendant actually used the false identification documents to complete wire fraud. It is only necessary that the Government prove beyond a reasonable doubt, that the defendant's intended use would have violated a particular Federal law. In this case, that the defendant intended to use a false identification document listed in the indictment to further a wire fraud scheme.

The district court judge instructed the jury in line with then-existing wire fraud elements. See, e.g., *United States v. ReBrook*, 58 F.3d 961, 966 (4th Cir. 1995). Although this circuit long held that materiality in the wire fraud statute was a matter of law for the court, the Supreme Court recently held that materiality of a false statement was a matter of fact for the jury. See *United States v. Neder*, 527 U.S. 1, 25 (1999) ("Accordingly, we hold that materiality of falsehood is an

element of the federal mail fraud, wire fraud, and bank fraud statutes."). Therefore, the factual elements of wire fraud under 18 U.S.C. § 1343 are: 1) a scheme to defraud; 2) use of an interstate wire in furtherance of the scheme; and 3) statements or omissions in the wire communication that were material to the scheme. See *Neder*, 527 U.S. at 10. As applied in the context of a § 1028(a)(3) prosecution, the government must prove that Mora intended to engage or engaged in a scheme to defraud, intended to use or used interstate wire in furtherance of the intended scheme, and that Mora intended to make or made material misstatements in the wire communication.

Mora did not object in the district court to the failure to include the materiality element or on any other ground regarding the jury instructions, and thus our review is for plain error. See R. Fed. Crim. P. 52(b); *United States v. Williams*, 152 F.3d 294, 300 (4th Cir. 1998). To reverse for plain error occurring at trial, a reviewing court must: 1) identify an error; 2) that was plain; 3) that affects substantial rights; and 4) that seriously affects the fairness, integrity or public reputation of judicial proceedings. See *United States v. Olano*, 507 U.S. 725, 732 (1993); *United States v. Brewer*, 1 F.3d 1430, 1434-35 (4th Cir. 1993).

In this case, there was error because the district court omitted an essential element of the offense of wire fraud from its jury instructions. To be plain, an error must be clear or obvious, at least by the time of appeal. See *Olano*, 507 U.S. at 734. An error is clear or obvious "when the settled law of the Supreme Court . . . establishes that an error has occurred. . . ." *United States v. Neal*, 101 F.3d 993, 998 (4th Cir. 1996). In light of *Neder*, we conclude that this error was plain.

We next address whether the error affected substantial rights, *i.e.*, that it was prejudicial. See *Olano*, 507 U.S. at 734; *United States v. Hastings*, 134 F.3d 235, 240 (4th Cir. 1998) (explaining that prejudice is shown when it "actually affected the outcome of the proceedings"). Mora contends that this error taints his conviction and thus requires reversal because he is entitled to have a jury determine that all elements of the offense have been proven. The failure to instruct on an element of the offense, however, does not require reversal when "the omitted element was uncontested and supported by overwhelming

evidence, such that the jury verdict would have been the same absent the error." *Neder*, 527 U.S. at 17. When no objection is preserved below, the burden of proof is on the defendant—not the government—because we undertake plain error, rather than harmless error, review. See *United States v. Strickland*, 245 F.3d 368, 379-80 (4th Cir. 2001). Under this inquiry, it is proper to consider the evidence actually presented at trial. See *United States v. Brown*, 202 F.3d 691, 699-703 (4th Cir. 2000).

It is important to remember there was no instruction to the jury defining the scheme or artifice to defraud under the wire fraud statute, 18 U.S.C. § 1343. And there was no instruction on materiality. The government, however, argued to the jury that the people who used the workers hired by AmBien as asbestos removers had been defrauded because "they were assured that they were getting workers who had been fully trained in every aspect to remove asbestos" and "because they anticipated that they would be getting workers who were, first of all, qualified to work in the United States."

But not one contractor who used the AmBien workers to remove asbestos testified in the case, so that aspect of proof of materiality, at least, was not supported by such testimony. It is true that one of the secretaries testified that such contractors required the green cards, Social Security cards, drivers licenses, I-9 forms and asbestos removal training class papers, and Mora testified that one of such contractors, at least, did. Bearing in mind that the acts for which Mora was indicted refer wholly to Social Security cards and green cards, these acts could not possibly have been material in ascertaining whether or not the workers were "fully trained in every respect to removing asbestos" any more than whether or not the possession of a drivers license is material in ascertaining whether an automobile is negligently operated. Pursuant to the statute involved here, the term "*employer* shall mean the independent contractor or contractors and not the person or entity using the contractor labor." 8 C.F.R. § 274a.1(g). That definition may well bear on the materiality to the various contractors for it may determine criminal or civil liability. So the materiality of the conduct with which Mora was charged is quite in dispute and the jury should have been instructed. Mora specifically denied the wrongdoing with which he was charged so the element of

materiality was contested.[4] Our decision in *United States v. Brown*, 202 F.3d 691, 701 (4th Cir. 2000), requires that we find the error to be not harmless. ("But if the element was generally contested, and there is evidence upon which a jury could have reached a contrary finding, the error was not harmless.")

The standard for prejudice under harmless or plain error standards is the same. See *United States v. Strickland*, 245 F.3d 368, 379-80 (4th Cir. 2001). The error being not harmless and prejudicial, we are of opinion that substantial rights of the defendant were affected, and the fairness of the judicial proceeding was seriously affected. See *Olano*, 507 U.S. at 732. Under the circumstances present in this case, we must vacate the order of conviction and remand for a new trial.

We express no opinion on any question which was not addressed in this opinion. We are aware that the case of *Burks v. United States*, 437 U.S. 1, 18 (1978), requires a decision on the sufficiency of the evidence as it overruled *Bryan v. United States*, 338 U.S. 552 (1950). Because an element of the offense was missing in this case, however, we believe that it would not be fair either to the government or to Mora to pass on that question at this stage of the proceeding, and we address only the failure to instruct on materiality and the scheme to defraud at this time.

*VACATED AND REMANDED FOR A NEW TRIAL*

---

[4]We note also that the jury reported at one time that it was hung.